UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | BANKRUPTCY NO. 04-11758 |
| | : | CHAPTER 7 |
| DAVID E. ZOFKO, DEBTOR | : | |
| | : | |
| THE CADLE COMPANY, Plaintiff | : | ADVERSARY NO. 04-1157 |
| VS. | : | DOCUMENT NO. 26 |
| DAVID E. ZOFKO, Defendant | : | |

APPEARANCES:

MICHAEL A. AGRESTI, ESQ., ERIE, PA, ATTORNEY FOR DAVID E. ZOFKO
MARK G. CLAYPOOL, ESQ., ERIE, PA, ATTORNEY FOR THE CADLE COMPANY
ROGER J. STEVENSON, ESQ., AKRON, OH, ATTORNEY FOR THE CADLE COMPANY

WARREN W. BENTZ
U.S. BANKRUPTCY JUDGE

JUNE ___27_____, 2006

OPINION[1]

Introduction

David E. Zofko ("Debtor" or "Mr. Zofko") filed a voluntary Petition under Chapter 7 of

the Bankruptcy Code on July 7, 2004.  The Cadle Company ("Cadle") holds a judgment against

the Debtor which was originally entered by Cadle as assignee of National City Bank, Northeast,

in Trumbell County, Ohio.  Cadle's judgment is the basis for its proof of claim which appears as

Claim No. 3 on the Court Claims Register in the amount of $569,229.71.  On July 29, 2004,

Cadle filed its Complaint to Determine Dischargeability of Debt and to Object to Discharge

---

[1]This Opinion constitutes the findings of fact and conclusions of law required by
Fed.R.Bankr.P. 7052.  This Court has jurisdiction over this Adversary Proceeding pursuant to 28
U.S.C. §1334, §157(a).  This is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(J).  Venue in
this Court is appropriate pursuant to 28 U.S.C. §1409(a).

("Complaint")[2].  Following several status conferences and extensions of time to conduct

discovery and after the refusal of Cadle's Motion for Summary Judgment, a trial/evidentiary

hearing was held on January 26, 2006.  In opening argument, counsel for Cadle stated that there

are two prongs to the Complaint, 11 U.S.C. §727(a)(4)(A) and §727(a)(5).  Cadle asserts that the

Debtor is not entitled to a discharge because "the debtor knowingly and fraudulently, in or in

connection with the case – made a false oath or account," 11 U.S.C. §727(a)(4)A and because

"the debtor has failed to explain satisfactorily, before determination of denial of discharge under

this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."  11

U.S.C. §727(a)(5).  Following the conclusion of the evidentiary hearing/trial, an Order which

dismissed the Complaint was entered on February 3, 2006.

Presently before the Court is Cadle's Motion for Additional Findings and Conclusions.

We now amplify the basis for our decision.


Facts

Mr. Zofko is a professional engineer.  He enjoyed success and, by 1992, he and his then

wife, Marian Zofko, had accumulated a net worth of $4,000,000.  Their assets included a

residence in Warren, Ohio which then had a value of $360,000 and was subject to a $250,000

mortgage (the "Residence") and a hunting camp, which had been purchased together with its

furnishings in 1977 located in Tidioute, Pennsylvania (the "Tidioute Property") which then had a

value of $35,000 and was not subject to any mortgages.

---

[2]In the Complaint, Cadle initially sought a determination that its judgment is nondis-
chargeable pursuant to 11 U.S.C. §523 and/or that the Debtor be denied a discharge under 11
U.S.C. §727.  Cadle pursued nondischargeability under §727(a)(4)A and §727(a)(5) at trial.

Upon the advice of tax advisors, the Debtor and Marian Zofko created The David E. Zofko and Marian L. Zofko Children's Trust ("Children's Trust") on December 7, 1992 for the benefit of their two children.  The Debtor's brother-in-law was named as Trustee.  In 1992, Mr. Zofko and Marian Zofko gifted the Residence and the Tidioute Property to the Children's Trust.

After 1992, Debtor's financial condition deteriorated.  Debtor was involved in a construction project known as Surrey Point Condominiums which was financed by National City Bank ("NCB") under a certain Note in the original amount of $500,000 (the "Note").  NCB called the Note in 1994 and Cadle acquired the Note from NCB.  The Surrey Point property, which the Debtor had valued at $1,000,000 was sold by Cadle for $235,000.

In 1996, Marian Zofko initiated a divorce action to obtain a divorce from Mr. Zofko.  The divorce case involved protracted litigation over the Children's Trust, property distribution, and support issues.  As a result of the divorce, the Children's Trust retained ownership of the Residence and the Tidioute Property.  Personal property was split between the parties and Marian Zofko obtained a Qualified Domestic Relations Order against the Debtor's IRA accounts.  Debtor obtained the right to occupy the Tidioute Property for up to 23 years at a rental rate equivalent to the real estate taxes, the real estate insurance premiums, and the cost of maintenance, and the right to purchase the Tidioute Property from the Children's Trust during the term of his tenancy for the fair market value.  Following the divorce, Mr. Zofko did not work for a period of time and occupied the Tidioute Property.  The right to occupy the Tidioute Property was further memorialized in a Lease dated June 1, 2000 which gave the Debtor the right to occupy the property at a rental of $500 per month until June 1, 2020.

In 1998, Cadle sued Mr. Zofko and the Trustee of the Children's Trust alleging that Mr.

3

Zofko fraudulently transferred assets to the Trustee.  This lawsuit culminated in a Settlement

Agreement in July, 1999.  The Children's Trust paid Cadle $40,000 and Mr. Zofko turned over

to Cadle his interest in certain IRA accounts, gas and oil well partnership interests, certain

stocks, and a Russian Meat Processing Plant venture.

Mr. Zofko and the Children's Trust had an insurance policy on the Tidioute Property.

The insurance application form reflects an actual value for the Tidioute Property of $167,000

and contents of $83,000.  The Tidioute Property was insured for $100,000 for the structure and

$25,000 for contents from April 9, 2002 through April 15, 2005.  The policy was extended for

the period April 15, 2005 through April 15, 2006 during which time the personal property

coverage amount increased to $50,000.  Those coverage amounts  are estimates of replacement

cost based on the square footage of the building and then a percentage of the replacement

building cost for the value of the contents.

In April, 2001, the Tidioute Property was burglarized.   The incident caused damage to

the dwelling and the loss of personal property located inside.  In July, 2001, Mr. Zofko received

$25,686 from a renter's policy and the Children's Trust received additional monies from a

homeowner's policy.  Debtor utilized a portion of the insurance proceeds that he received to

replace his daughter's items and to repair damage to the Property.

Mary Jeanine Pipino ("Mrs. Pipino") is Mr. Zofko's sister.  James D. Pipino ("Mr.

Pipino") is Mrs. Pipino's husband.  Mrs. Pipino has been the owner of record of a single family

dwelling located at 443 North Rhodes Avenue, Niles, Ohio (the "Rhodes Property") since

November 17, 1992.  Mr. And Mrs. Pipino lived at the Rhodes Property until October, 2000

when they purchased a new home.

4

Mr. Zofko and Mr. Pipino signed a Rental Agreement relating to the Rhodes Property. Under the Rental Agreement, Mrs. Pipino is the landlord and Mr. Zofko is the tenant.  The Rental Agreement is for a term of 20 years commencing on January 1, 2001 and terminating December 31, 2021.  The rent is $2,000 per month and the tenant pays all utilities.  The Rental Agreement provides for a security deposit of $5,000.

Mr. Zofko's girlfriend, Rebecca, was the primary resident of the Rhodes Property.  Most of the personal property at the Rhodes Property belonged to Rebecca.  Mrs. Pipino had left a few pieces of furniture and window treatments in the property which she never expected to get back. An insurance policy which covered losses for personal property at the Rhodes Property in the amount of $75,000 plus additional coverage for certain scheduled items was designed to insure Rebecca's personalty.  Mr. Zofko continued to utilize the Tidioute Property as his main residence and occasionally stayed at the Rhodes Property which was located near his parent's home.

Mr. Zofko paid Mrs. Pipino a $35,000 amount as an advance toward rental payments. His accountant, Mr. Metzger, treated payments on the Rhodes Property as an installment purchase for tax purposes in 2001 and 2002.  Sometime in 2004, Mr. Metzger prepared, and David E. Zofko filed, a federal tax return for the year 2003.  Based on a conversation in which David E. Zofko said that he hadn't made the payments to his sister, that he was making some rent payments to her, but not on a monthly basis because he didn't have the cash, Mr. Metzger concluded that, in effect, whatever agreement they might have had was gone, and did not include a deduction for mortgage interest on David E. Zofko's 2003 tax return.  Mr. Metzger assumed that David E. Zofko did not have any ownership interest in the Rhodes Property in 2003 and

2004.  Mr. Zofko also claimed a deduction on his income tax returns for real estate taxes paid on the Rhodes Property.

While Mr. Zofko may have desired to purchase the property and treated it for tax purposes in 2001 and 2002 as if there was a purchase agreement, there is no evidence that a land contract purchase agreement existed or that such an arrangement was ever discussed with the Pipino's.

During the period from 2001 through at least 2004, Debtor was employed by Aerotech Mechanical.  Debtor received a salary and a travel allowance for expenses associated with his work.  Debtor was inconsistent in reporting the travel allowance for Federal Income Tax purposes, but the travel allowance was used for travel-related expenses related to employment.

Debtor's tax returns reflect total income of $59,950 in 1992; $57,259 in 2003; and $58,758 in 2004.  Debtor included the travel allowance on Schedule C in 2002 and deducted expenses against the reported income.  In 2003 and 2004, Debtor did not report the travel allowance nor did he deduct the travel expenses associated with his employment.

Included in Debtor's gross income on his tax returns is "working interest investment" in Everflow Eastern Partners in the amount of $632 in 2002; $531 in 2003; and $1,881 in 2004.

Also included in Debtor's gross income on Schedule C of his 2004 Federal income return is $6,350 in gross receipts for professional engineering activities.  Those receipts were comprised of $500 paid by Action Electric in January, $500 paid by ES&C International in March, $350 paid by Hope Christian Fellowship in March, $500 paid by Bossa Nova Cleveland in April, $2,000 paid by ES&C International in April, and $2,500 paid by Growth Business Development in June of 2004.

6

The Debtor's parents, Andrew and Anna Mae Zofko, created a trust in 1993 (the "Zofko Family Trust" or "Trust").  Debtor's sister, Mrs. Pipino, is named as Trustee.  Andrew Zofko is deceased.  The Trust holds assets valued at approximately $400,000.  The Trust is to provide for Anna Zofko's health and welfare, and upon her death, it is divided between the Debtor, Mrs. Pipino and another brother.  Until the day before trial, even the Trustee, Mrs. Pipino, did not believe that the Debtor was a contingent beneficiary of the Zofko Family Trust.  It was believed that the Trust had been amended to exclude the Debtor while his divorce action with Marian was pending.  On April 12, 2004, Mr. Zofko borrowed $4,000 from the Zofko Family Trust.  Mr. Zofko has no records to show that the loan has been repaid.

Andrew and Anna Mae Zofko ("Debtor's Parents") were the record owners of a dwelling at 426 Bonnie Brae Drive, Niles, Ohio (the "Bonnie Brae Property").  On February 8, 1990, Debtor's Parents transferred the Bonnie Brae Property to Debtor's sister, Mrs. Pipino.  Debtor's mother presently resides in the Bonnie Brae Property.  Mrs. Pipino learned the day before trial in this matter that the transfer to her is subject to an annuity agreement and that upon Anna Zofko's death, the proceeds from the Bonnie Brae Property are to be divided, one-third to Mrs. Pipino, one-third to a brother, Martin Zofko, and one-sixth to each of Mr. Zofko's two children.

Mr. Zofko maintained several credit card accounts.  Prior to March, 2002, he received statements for the credit card accounts at the Tidioute Property or the Bonnie Brae Property.  In 2002, when Mr. Zofko began spending more time away from Tidioute and more time in Niles due to his parents' health and due to his job location, he directed that the statements be sent to the Rhodes Property to insure that someone would receive them and that they be timely brought to his attention.

7

On November 15, 2005, Mr. Zofko submitted an employment application which listed the Rhodes Property as his address and stated that he had been employed by Aerotech at a salary of $82,000 per year.

Cadle aggressively pursued collection of the obligation from Mr. Zofko. It pursued the Children's Trust which resulted in a settlement in which it received a payment from the Trust, Debtor's oil and gas interests, and his IRA accounts. The Debtor filed his bankruptcy Petition when Cadle foreclosed on a vacant lot in Tidioute and made attempts to garnish the Debtor's wages. Cadle is Debtor's main creditor. Debtor states that Cadle was ruthless and aggressive. They had deposed him twice pre-bankruptcy and had all of his financial information. He had nothing to hide from Cadle. "They turned every stone."

## Discussion

### Discharge Standard

Courts have long recognized that bankruptcy is intended to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh. In re Renshaw, 222 F.3d 82, 86 (2d Cir. 2000) (quoting Williams v. U.S. Fidelity & Guar. Co., 236 U.S. 549, 554-555, 35 S.Ct. 289, 59 L.Ed. 713 (1915)). However, bankruptcy is not only an ameliorative right of the debtor; it is also a remedy of the creditor. Matter of Marchiando, 13 F.3d 1111, 1115 (7th Cir. 1994). Accordingly, although bankruptcy is concerned with giving honest debtors a new beginning, "there are circumstances where giving a debtor a fresh start in life is not the paramount concern and protection of the creditor becomes more important. Renshaw, 222 F.3d at 86. Thus, the law does not allow debtors to escape all financial obligations by declaring bankruptcy. However, in large part because of bankruptcy's underlying concern for affording a new beginning, statutory exceptions to discharge are generally construed "narrowly against the creditor and in favor of the debtor." In re Pelkowski, 990 F.2d 737, 744 (3d Cir. 1993). The creditor opposing discharge therefore has the burden of establishing that an obligation is not dischargeable. Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed. 2d 755 (1991).

In re Mehta, 310 F.3d 308, 311 (3d Cir. 2002).

"Congress described §727's discharge provision as 'the heart of the fresh start provisions of the bankruptcy'." Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993) quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 384 (1977). A denial of discharge imposes an extreme penalty and should not be taken lightly. Rosen v. Bezner, 996 F2d at 1531; In re Chalasani, 92 F3d 1300, 1310 (2d Cir. 1996).

"Section 727(a)(4)(A) of the Bankruptcy Code provides, in pertinent part, that the Court shall grant a debtor a discharge unless the debtor 'knowingly and fraudulently, in or in connection with a case[,] made a false oath or account'." In re Georges, 138 Fed. Appx. 471, 472 (3d Cir. 2005) quoting 11 U.S.C. §727(a)(4)(A). "The objecting party must prove an 'actual intent on the part of the bankrupt to hinder, delay, and defraud his creditors'," In re Georges at 472 quoting In re Topper, 229 F.2d 691, 692 (3d Cir. 1956).

Section 727(a)(5) provides that the Court shall not discharge a debtor if "the debtor has failed to explain satisfactorily. . .any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. §727(a)(5).

Many courts find that there is a shifting burden of proof under §727(a)(5):

Movants, as plaintiffs, bear the burden of proof. Fed.R.Bankr.P. 4005 ("At a trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection"). Further, under §727(a)(5), the plaintiff also bears the initial burden of production; i.e., to establish, by a preponderance of the evidence, that the debtor had a cognizable interest in a specific identifiable property at a time not too far removed from the bankruptcy which she now no longer possesses. Pyramid Technology Corp. v. Cook (In re Cook), 146 B.R. 934, 940-41 (Bankr.E.D.Pa. 1992); McGowan v. Beausoleil (In re Beausoleil), 142 B.R. 31, 37 (Bankr.D.R.I.1992); M.R. Toupin, Inc. v. Turpin (In re Turpin), 142 B.R. 491, 496 (Bankr.M.D.Fla.1992). It is insufficient to merely allege that the debtor has failed to explain losses, the plaintiff must produce some evidence of an identifiable asset loss. Carter Engineering Co. V. Carter (In re Carter), 236 B.R.

173, 180 (Bankr.E.D.Pa.1999); <u>LaBrioche, Inc. v. Ishkhanian (In re Ishkhanian)</u>,
210 B.R. 944, 953 (Bankr.E.D.Pa.1997).  Once the plaintiff has met this burden
and thus made out a prima facie case, the burden of production (i.e., coming
forward with evidence) shifts to the debtor to explain satisfactorily the losses or
deficiencies.  <u>Cook</u>, 146 B.R. at 941.  The plaintiff's ultimate burden of proof
does not obviate the debtor's obligation to come forward with a satisfactory
explanation.  <u>Chalik v. Moorefield (In re Chalik)</u>, 748 F.2d 616, 619 (11th Cir.
1984).

<u>In re Mezvinsky</u>, 265 BR 681, 689 (Bankr. ED PA 2001) (footnote omitted).

<u>§727(a)(4)(A) - False Oath</u>

Cadle points to a list of assets that it asserts were not properly reported on the Debtor's

bankruptcy schedules and statement of financial affairs to conclude that the Debtor should be

denied a discharge under §727(a)(4).

<u>i.  Real Property - Tidioute</u>

Debtor lists "None" on Schedule A – Real Property.  As part of Debtor's divorce

settlement, he obtained the right to purchase the Tidioute Property from the Children's Trust

during his 23 year period of occupancy "for its fair market value."  This option is memorialized

in a Judgment Entry in the divorce proceeding dated May, 1997, which was brought to his

attention by counsel for Cadle at the Debtor's deposition in September, 2005.   The Trustee of

the Children's Trust is the brother of the Debtor's ex-spouse.  There is no reason to believe that

Debtor could obtain ownership of the Tidioute Property for anything less than its fair market

value.  Thus, the option is immaterial and of no value.

### ii.  Tangible Personal Property

On Schedule B – Personal Property, Debtor lists household goods and furnishings with a current value of $100, books $500, clothing $1,000, watch $100, shotgun $800, and bow and arrows $200.

When Debtor acquired the Tidioute Property in 1977, it was purchased furnished.  When the Tidioute Property was transferred to the Children's Trust, Debtor intended that the transfer include the personal property the same as when it was purchased.  Debtor considered the personal property at the Tidioute Property as belonging to the Children's Trust.

When Debtor received the insurance proceeds three years prior to the Bankruptcy, part of it was used to repair damage to the structure and part was used to replace personalty.

At the time of the bankruptcy filing, Debtor testified that market value of the personalty was $2,000-2,500.

Even if Debtor erroneously considered the personalty property of the Children's Trust, all of the property would have been within the allowable exemptions and make no difference to creditors.

Similarly, the few used items which Mrs. Pipino left behind at the Rhodes Property are of insignificant value and immaterial.


### iii.  Partnership Interests

On Schedule B, Mr. Zofko shows "None" for interests in partnerships or joint ventures. As part of a Settlement Agreement with Cadle and the Children's Trust in 1999, Mr. Zofko assigned all of his rights in the Kleese Development Partnership and gas and oil well partnership

11

interests to Cadle.  Even though Mr. Zofko assigned those rights to Cadle, Mr. Zofko continued

to receive certain royalty checks in minor amounts and also accepted $2,000 offered by Kleese

for his interests two or three years after the Kleese interests were assigned to Cadle.

While Mr. Zofko may have received royalty checks in varying amounts from $10 to $200

which in the aggregate totaled less than $800 in any year, Mr. Zofko had assigned those interests

to Cadle.  The $2,000 from Kleese was obtained prior to the bankruptcy filing.  Mr. Zofko

had assigned those rights to Cadle and believed that Cadle had the right to take those interests at

any time.  Mr. Zofko therefore did not knowingly and fraudulently make a false oath when he

indicated "None" for interests in partnerships or joint ventures.


### iv.  Tax Refund

On Schedule B, Mr. Zofko shows "None" for tax refunds owing the Debtor.  On his

Federal Income Tax return for 2003, filed in 2004, Mr. Zofko owed a balance of $89.  On his

2004 return, filed in 2005, Mr. Zofko received a refund of $1,227.  The 2005 refund was not

owed at the time of the bankruptcy filing.

On December 3, 2004, Mr. Zofko received a property tax refund of $268 from

Pennsylvania.  The amount is de minimus and at the time of the bankruptcy filing, Mr. Zofko did

not have an understanding that he was entitled to the refund.


### v.  Crawford Judgment

In 2000, four years prior to the bankruptcy, Mr. Zofko obtained a judgment against

Crawford, a former tenant, in the amount of $7,600 for damages incurred in 1997 and 1998.

12

Debtor had previously offered the Judgment to Cadle so that Cadle could attempt to collect on it.

The Judgment is uncollectible and of no value.  Mr. Zofko did not knowingly or

fraudulently make a false oath with respect to the Crawford Judgment.


### vi.  Olds Bravada

On Schedule B, Mr. Zofko lists "None" for automobiles.  On Schedule D, Mr. Zofko lists

GMAC as holding a secured claim with a lien on a 2000 Olds Bravada.  On Schedule G, Mr.

Zofko lists an executory contract with GMAC for a Lease on a 2002 Olds Bravada.  On Schedule

J, Mr. Zofko lists as expenses for installment payments an auto expense of $590 and an

additional auto expense of $522.11 for a 2000 Olds Bravada.  On Debtor's Statement of

Intentions, Debtor indicates that his obligation to GMAC for the 2000 Olds Bravada will be

reaffirmed.

The failure to list the 2000 Olds Bravada on Schedule B was clearly an oversight, most

likely by counsel for the Debtor.  The vehicle is disclosed in numerous other places in the

Schedules.  Clearly, Debtor did not make a knowing or fraudulent false oath with respect to the

Olds Bravada.


### vii.   Travel Expense Stipend/Business Income/License

On Schedule I, Debtor indicates that he is a Professional Engineer employed by Aerotech

Mechanical Contractors earning a salary of $5,400 per month.  Debtor also indicates that "[i]n

the past (excluding the past year), Debtor has performed limited engineering services as an

indepedent (sic) consultant.  At the present time, no such work is being performed as there is no

demand.  It is possible that such work will be present in the future should the economy continue

to grow."  On his Statement of Financial Affairs, Debtor states as income from employment or

operation of business:

| | |
|---|---|
| $62,400.00 | 2002 Aerotech Gross Wages |
| $62,400.00 | 2003 Aerotech Gross Wages |
| $30,000.00 | 2004 Aerotech Gross Wages thru June 30, 2004 |

Debtor also states that he has no income other than from employment or operation of business.

On Schedule B, Debtor states "None" when asked if he owns any licenses.

Debtor's income tax returns show a salary of $45,766 for 2002 and total income of

$59,950; for 2003, a salary of $50,566 and total income of $57,259; and for 2004, a salary of

$55,980 and total income of $58,758.  The 2002 income includes a net of $12,894 from Schedule

C, Profit from Mr. Zofko's personal engineering business.  The Schedule C includes $18,000,

other income received from Aerotech as a travel expense and reported to the Debtor on Form

1099.  In 2003, Debtor had no gross income from the operation of a business, but did incur

expenses which resulted in a net loss of $9,338.  No travel expense stipend from Aerotech was

included on Schedule C.  In 2004, Debtor reported gross income of $6,350 on Schedule C with a

net of $2,258.  No travel expense stipend from Aerotech was included in Schedule C.

In addition to Debtor's salary at Aerotech, Debtor received a travel allowance.   The

travel allowance does not appear on Debtor's schedules.  However, neither do Debtor's travel

expenses appear on his schedules.  Debtor testified that the allowance did not cover his expenses.

Therefore, any omission is immaterial and does not reflect an intent to knowingly and

fraudulently make a false oath.

Debtor's income from his business activities is minuscule.  In 2003, there was none and

14

Debtor incurred expenses which resulted in a loss.  In 2004, Debtor generated gross income of $6,350.  Those receipts were comprised of $500 in January, $850 in March, $2,500 in April, and $2,500 in June.  Debtor had no receipts in 2004 after the June receipt.  With related expenses, Debtor generated a profit of $2,558.  Debtor disclosed the possibility of earning future income from this business on Schedule I.  We find that the income disclosed by the Debtor fairly represents his earnings and that Debtor had no intent to knowingly and fraudulently make a false oath regarding business income.

Similarly, Debtor stated that he was a professional engineer.  A professional engineer must have a license.  The license is personal to its holder and there is no evidence that it has value.  Debtor had no intent to knowingly and fraudulently make a false oath when he failed to list the license as an asset.

### viii.  Insider Preference

The Statement of Financial Affairs directs the Debtor to "list all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders."  Mr. Zofko lists none.

The parties stipulated that "[o]n January 12, 2004, David E. Zofko borrowed $4,000 from the Zofko Family Trust.  As of January 6, 2006, he had not repaid that loan."  Debtor testified that it was not repaid.  Accordingly, there was no insider preference.

### ix.  Bank Account for Alexander Broggan

Debtor did not list a bank account held for Broggan as property held for another on his

Statement of Financial Affairs.  Debtor opened this account for a Russian friend.  The account

never held over $100 and Debtor made deposits into it to cover service charges to keep it open.

As of July 5, 2004, the account had an $8 balance.  Debtor had no intent to knowingly or

fraudulently make a false oath when he failed to list the account.


<u>x.  Leases</u>

There is no evidence that Debtor has any interest in or control over the Children's Trust.

The Children's Trust was set up in 1992 at a time when the Debtor enjoyed financial success.

Debtor leases the Tidioute Property from the Children's Trust under a 20 year lease for

$500 per month.  Debtor did not show the Lease on Schedule G, Executory Contracts and

Unexpired Leases, but does show the rental payment as an expense on Schedule I and also states

in Item 14 of the Statement of Financial Affairs that he holds the Tidioute Property as property

of the Children's Trust.  Debtor did not list a $500 Security Deposit on his schedules.

Debtor also holds a 20 year Lease on the Rhodes Property.  The property is owned by

Mrs. Pipino and is in close proximity to the residence of the Debtor's parents.

Debtor originally desired to purchase the Rhodes Property.  He paid an advance rental

payment of $35,000 and treated his payments as a purchase for tax purposes in 2002.  The Lease

Agreement requires a $5,000 security deposit.  It is unclear whether such deposit was actually

paid.  There is no evidence that there ever was a written land contract or that such an

arrangement was even discussed or agreed to by Mrs. Pipino.  Debtor did not treat the rental as a

purchase for tax purposes after 2002.

In 2004, Debtor's fiancee, Rebecca, was the primary resident at the Rhodes Property and

was the individual who primarily made the Lease payment from her income.

We do not find that Debtor's failure to list the security deposits on Schedules B or to list the Leases on Schedule G was done with an intent to knowingly and fraudulently make a false oath.

### xi.  Zofko Family Trust and Annuity

On Schedule B, Debtor states that he has no contingent or noncontingent interests in a trust.  The Debtor's parents created the Zofko Family Trust in 1993.  Until trial of this matter, Debtor was unaware that he was a beneficiary of the Zofko Family Trust.  Even the trustee, Mrs. Pipino, was surprised to learn the day before trial that the Debtor will be a beneficiary upon the death of his mother.

Debtor did not know of this interest at the time of the bankruptcy filing and therefore had no intent to knowingly and fraudulently make a false oath when he failed to list this interest on his schedules.

### xii.  Credit Cards/Addresses

Debtor lists the Tidioute Property as his address on the Petition.  On the Statement of Financial Affairs, Debtor lists the Bonnie Brae Property (his mother's residence) as a prior address.  The Rhodes Property is not listed.

At a time when Cadle had a large judgment against the Debtor and he had poor credit, Debtor continually received credit card applications by mail.  Debtor elected to mail some of them in to see if could actually obtain credit.  Debtor obtained several cards.  Credit card

statements were mailed to the Tidioute Property until 2002.  During 2002, the Debtor's address

was changed with the credit card companies and thereafter the statements were mailed to the

Bonnie Brae Property or the Rhodes Property.

Debtor changed the addresses to avoid receiving the statements late as he was traveling

more for work and spending more time in the Niles area due to the illness of his parents.  Debtor

continued to make payments on the credit card obligations and indicated that he would have

been able to continue servicing his credit card debt had he not been compelled to file for

bankruptcy protection due to the foreclosure and wage garnishment that was prosecuted by

Cadle.

At the time of bankruptcy filing, Rebecca was the primary resident at the Rhodes

Property.  We find that Debtor's failure to list the Rhodes Property as a prior address was not

done with an intent to knowingly and fraudulently make a false oath.


### xiii.  Playing Fast and Loose

Cadle directs our attention to the Debtor's sale of his Kleese interests, Debtor's

acquisition of credit cards, a mechanics lien that Debtor placed on certain property owned by the

Children's Trust and the Debtor's dealings with Alexander Broggan to assert that Debtor "played

fast and loose with his (and other people's assets) and with the reality of his affairs."

We have previously discussed the Kleese transaction and the credit cards.  We do not

find that the Debtor was "playing fast and loose."  The Mechanics Lien was placed on property

owned by the Children's Trust in 1996 to prevent the property from being sold by the Trustee for

a price that the Debtor believed was unfairly low and during an acrimonious divorce proceeding.

18

This event took place many years prior to the bankruptcy filing.

Cadle points to cash gifts from Debtor's friend as evidence of the Debtor's "playing fast and loose."  There is no evidence that the funds received from Broggan were anything other than gifts from a friend.

We find that there is no sufficient evidence to support Cadle's claim that the Debtor "played fast and loose."


### §727(a)(5) - Failure to Explain Loss or Deficiency of Assets

Debtor accumulated significant assets by the early 1990s.  As an estate planning strategy, the Debtor's then Residence and the Tidioute Property were transferred to the Children's Trust.

An acrimonious divorce proceeding resulted in a payment of legal costs, a split of personal property owned by the couple, a child support obligation, and a Qualified Domestic Relations Order in favor of the wife in the Debtor's IRA interest.  Following the divorce, Debtor suffered a period of unemployment.

Debtor also lost significant monies on his business ventures.  Included in Debtor's calculation of net worth was the Surrey Point project valued at $1,000,000 which Cadle sold for $235,000.  Cadle has also obtained other of the Debtor's assets in its efforts to satisfy its judgment.

Cadle points to large insurance coverage amounts.  Those amounts reflect replacement costs and not actual cash value.  The Debtor satisfactorily explained his use of insurance proceeds recovered from the losses suffered.

Debtor provided a credible and complete picture of the circumstances that led to the loss

of assets.

## Conclusion

Cadle points to numerous assets that it believes were not properly included on the Debtor's Schedules and Statement of Financial Affairs.

Most of the asserted falsities relate to items of trivial value.  In numerous cases, the inaccurate answers were disclosed elsewhere on the Schedules.

Debtor's explanations are reasonable.  He had every reason to be accurate.  Cadle had pursued him relentlessly and he had every reason to believe that Cadle would continue "to turn over every stone" in connection with the bankruptcy filing.

While certain statements made by the Debtor were inaccurate, they are immaterial and of no effect on creditors.  Further, the Debtor did not knowingly and fraudulently make a false oath.  There was no intent on the part of the Debtor to hinder, delay and defraud his creditors.

Debtor enjoyed success and had accumulated significant assets by the early 1990s.  His fortunes rapidly declined.  Debtor has satisfactorily explained his loss of assets and the deficiency of assets to meet the Debtor's liabilities.

For the reasons stated in this Opinion, an Order was entered on February 3, 2006, which dismissed Cadle's Complaint.


_____/s/_____
Warren W. Bentz
United States Bankruptcy Judge

20

c: Michael A. Agresti, Esq.
Mark G. Claypool, Esq.
Roger J. Stevenson, Esq.